AO 106 (Rev. 04/10) Application for a Search Warrant

Approved by JLG: 1/29/26

agm 1/30/26

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

FILED

JAN 30 2026

JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY [initials], DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

A Verbatim flash drive wrapped in pink paper labeled #4 and located at the Oklahoma City Police Department Property Management Unit

Case No. MJ-26- 51-ALM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of and/or Accessing with Intent to View Child Pornography |

The application is based on these facts:

See Affidavit, attached hereto.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Kalli Wakefield, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/30/26

[signature]
*Judge's signature*

City and state: Oklahoma City, Oklahoma

AMANDA L. MAXFIELD, U.S. MAGISTRATE JUDGE
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Kalli Wakefield, Special Agent with the Federal Bureau of Investigation ("FBI"), Oklahoma City, Oklahoma, being duly sworn, depose and state as follows:

1. I have been employed as a Special Agent of the FBI since September of 2022 and have been assigned to the Oklahoma City FBI Field Office since February of 2023. During that time, I have conducted a wide variety of investigations, including cases involving child pornography and sexual exploitation of children.

2. As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3. The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and records. This Affidavit is made in support of an application for a warrant to search a Verbatim flash drive wrapped in pink paper labeled #4 ("the Subject Device"), which is presently located at the Oklahoma City Police Department Property Management Unit, within the Western District of Oklahoma.[1] As set forth below, there is probable cause to believe that the Subject Device contains instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2252A(a)(5)(B) (Possession of and/or Accessing with Intent to View Child Pornography).

4. This investigation, described more fully below, has revealed that Christian Rafford possessed and/or accessed with intent to view child pornography, and there is

---

[1] To my knowledge, this device was not manufactured within the state of Oklahoma.

probable cause to believe that evidence, fruits, and instrumentalities of his violations are located on the Subject Device.

5. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## TERMS

6. Based on my training and experience, I use the following technical terms and definitions:

a. An Internet Protocol ("IP") address is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static, or long-term, IP addresses. Other computers have dynamic, or frequently changing, IP addresses.

b. Single-source download applies to a file that is downloaded from one IP address only. In peer-to-peer ("P2P") software, users often download different parts of the same file from many other users at once in an attempt to gain the file quicker. A single-source download comes from one user/IP address instead.

c. A computer is an electronic, magnetic, optical, electrochemical, or

other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

**BACKGROUND ON P2P FILE SHARING**

7. A growing phenomenon on the Internet is P2P file sharing. P2P file-sharing software is designed to allow users to trade digital files through a worldwide network that is formed by linking computers together.

8. To access the P2P networks, a user first obtains the P2P software from the Internet. This software is used exclusively for the purpose of sharing digital files. In general, P2P software allows the user to set up file(s) on his/her computer so that the files can be shared with others running compatible P2P software. In essence, a user allows his/her computer to be searched and accessed by other users of the network. If another user finds a file of interest on his/her computer, the other user may download that file. A user obtains files by opening the P2P software on his/her computer and conducting keyword searches of the P2P network. The P2P software then conducts a search of all computers connected to that network to determine whether any files matching the search term(s) are currently being shared by any other user on that network.

9. BitTorrent, one type of P2P software, sets up its searches by keywords, typically on torrent websites. The results of a keyword search are displayed to the user. The website does not contain the actual files being shared, only the file referred to as a ".torrent" file. The user then selects one or more .torrent files from the results for download. The .torrent files contain instructions on how a user can download the file(s)

referenced in the torrent. The download of file(s) referenced by the .torrent file is achieved using a BitTorrent client/program, through a direct connection between the computer requesting the file(s) and the computer(s) sharing the actual file(s) (not the .torrent file but the actual files referenced in the .torrent file, using any BitTorrent client/program).

10. For example, a person interested in obtaining images of child pornography would open the BitTorrent website or program on his/her computer and conduct a keyword search for files using a term such as "preteen sex." The results of the search are returned to the user's computer and displayed on the torrent site. The user then selects a .torrent file from the results displayed. The .torrent file is the set of instructions a BitTorrent client/program needs to find the files referenced in the .torrent file. Once the .torrent file is downloaded, it is used by a BitTorrent client/program, previously downloaded and installed by the user, to download the actual files. The actual file(s) are downloaded directly from the computer or computers sharing the file(s). The download is achieved via the Internet. The downloaded file(s) are then downloaded/stored in an area previously designated by the user and/or the software. The downloaded files will remain until moved or deleted.

11. A P2P file transfer is assisted by reference to an IP address, which provides a unique location making it possible for data to be transferred between computers. The computer running the file-sharing application, in this case a BitTorrent application, has an IP address assigned to it while it is on the Internet. BitTorrent users are able to see the IP address of any computer system sharing files to them or receiving files from them.

12. Law enforcement officers using BitTorrent log the IP address which has sent

the files or information regarding files being shared. Investigators can then search public records, such as ARIN, that are available on the Internet to determine the Internet service provider who has assigned that particular IP address. Based upon the IP address, investigators can obtain subscriber information from the Internet service provider. The subscriber information identifies the individual to whom the Internet service account is registered.

13. One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a BitTorrent user downloading an image file may actually receive parts of the image from multiple computers/sources. The advantage of this is that it speeds up the time it takes to download the file. However, software used by the FBI to download files from P2P networks will only download from a single source, via a direct connection (i.e., a single-source download).

14. The computers that are linked together to form the P2P network are located throughout the world; therefore, the P2P network operates in interstate and foreign commerce. A person who shares child pornography files on a P2P network is hosting child pornography and therefore is promoting, presenting, and potentially distributing child pornography.

15. Even though the P2P network links together computers from all over the world and users can download files, it is not possible for one user to send or upload a file to another user of the P2P network. The software is specifically designed to only allow the

download of files that have been selected. A user does not have the ability to send files from his/her computer to another user's computer without their permission or knowledge. Therefore, it is not possible for one user to send or upload child pornography files to another user's computer without his/her active participation.

## BACKGROUND OF INVESTIGATION

### I. 2025 FBI Investigation

16. In the summer of 2025, law enforcement conducted an online undercover investigation to identify individuals possessing and sharing child pornography from June 13, June 14, July 28, and August 3, 2025, on the Internet using the BitTorrent P2P network. Law enforcement used a P2P file-sharing program that utilizes a single-source download process. Based upon my training and experience, I was familiar with P2P file-sharing, specifically the operation of the BitTorrent network. Law enforcement directed their focus to a computer using IP address 68.12.233.94 because on June 13, 2025, it was associated with a torrent file that referenced 6,407 files, at least one of which had been identified as a file of interest in child pornography investigations.

17. On June 13, June 14, July 28, and August 3, 2025, law enforcement completed single-source downloads of files depicting child pornography that IP address 68.12.233.94 was making available for others to download on the BitTorrent network. These files depicted, for example, a prepubescent female with an adult male's penis being inserted into the female's mouth; a male toddler with an adult male's penis being inserted into the toddler's anus; and a male rubbing his penis over a prepubescent female's vagina.

18. Law enforcement determined that Cox Communications, Inc. was the

Internet service provider for IP address 68.12.233.94. Pursuant to administrative subpoenas issued on June 27, 2025, Cox Communications, Inc. provided the following Internet subscriber information for the IP address 68.12.233.94 for the June 13 and 14, 2025, downloads mentioned above:

| | |
|---|---|
| Name: | Christian Rafford |
| Address: | Apartment 4, 2708 N Towry Drive<br>Midwest City, Oklahoma 73110 |
| Phone Numbers: | 405-473-6925 |

19. I determined that Rafford resides at the residence listed above. Specifically, on June 8, 2025, Rafford made a call to the Midwest City Police Department that a black Dodge Journey, driven by his mother-in-law, could be driving Rafford's children without car seats. The address Rafford provided for himself when making the report was the apartment listed above. On August 7, 2025, law enforcement installed a pole camera, which captures the public view of the apartment pathway and the parking lot in front of the building. On August 7, 2025, I observed a white male who matches the description of Rafford using the pathway that leads from Apartment 4 to the parking lot to walk to his vehicle and back to the pathway that leads to Apartment 4. Additionally, FBI observed alleged BitTorrent download activity utilizing the IP address 68.12.233.94 and occurring on August 11, 2025, between approximately 6:30 AM to 11:00 AM CDT. Through observation of the pole camera, I saw Rafford's vehicle parked outside of Apartment 4 for the entirety of the download time.

20. On August 12, 2025, a federal search warrant for Rafford's apartment was executed. Rafford was the only person who resided at the apartment, but his girlfriend and

her children often stayed there. During the search, FBI seized multiple digital devices and storage devices, some of which did not contain child pornography. However, the FBI found a Samsung Tablet in Rafford's bedroom, on the side of the bed, between the mattress and the bed frame. This tablet was forensically examined, and it had at least 27 video files that meet the federal definition of child pornography and at least 950 images that meet the federal definition of child pornography. One video, titled "163 very young 2.mp4", was a compilation video of three minutes and 27 seconds, that depicted a prepubescent female's vagina spread open with two adult fingers. In the next frame, a toddler's vagina is exposed with an erect penis near the vagina. The penis is moved and inserted into the toddler's anus where it is moved in and out of the anus. The following frame is a toddler laying on her back with her vagina exposed and a male's erect penis is inserted into the anus and then moved to the vagina where it is tapped quickly against it. The video continues in a frame-by-frame fashion depicting similar acts for the entirety of the video. The tablet also had an application that was indicative of BitTorrent usage. Finally, the tablet had a device connected to it called "Christian's AirPods Pro."

21. In addition to the tablet that was found, FBI located a micro SD card in the same room that the tablet was found. The SD card was forensically examined, and it contained at least 1,045 files that meet the federal definition of child pornography. My understanding is that at least some of these files (if not all of them), had been deleted from the device but were nonetheless recovered on the device.

22. On November 18, 2025, a Grand Jury indicted Rafford in the Western District of Oklahoma for: (1) Possession of and Accessing with Intent to View Material

Containing Child Pornography; and (2) Receipt of Child Pornography.

**II. Devices Seized After Rafford's Arrest**

23. On December 2, 2025, Rafford was arrested. Rafford was arrested after he had called the police on D.L. Rafford was staying in an RV on D.L.'s property, and Rafford believed that D.L. was stealing from him. When Rafford called to report D.L., police discovered there was an outstanding federal arrest warrant for Rafford, so he was arrested and transported to the custody of the U.S. Marshal's Service. On December 8, 2025, I testified at Rafford's detention hearing. At the conclusion of the hearing, he was ordered detained pending trial.

24. Following the detention hearing, on the evening of December 8, 2025, A.B., Rafford's girlfriend as of his federal arrest, contacted me via phone. She mentioned that she was unable to listen to all of the testimony at the detention hearing, presumably because it upset her. At the time of the call, A.B. was living at her mother's house with A.B.'s three minor children and A.B.'s mother. A.B. told me that she found a tablet that was hidden under A.B.'s dresser in A.B.'s bedroom. A.B. did not recognize this tablet, but she said it was locked, and she was unable to access it. A.B. stated that the tablet does not belong to her or any of her minor children, so she believes it belonged to Rafford. A.B. also told me that D.L. had a cell phone and a laptop that belonged to Rafford. I retrieved the tablet from A.B. on December 9, 2025, and submitted it to the Oklahoma City FBI Field Office Evidence Room, where it is presently located. The tablet is a silver Crelander Android Tablet, with serial number T402024001.

25. In a follow-up call on December 30, 2025, in which I asked A.B. clarifying questions, A.B. explained to me that only herself and her minor children stayed in her bedroom and that the tablet did not belong to any of them. She also indicated that Rafford stayed the night in her bedroom the night before his federal arrest (the night of December 1, 2025). She also stated that she spoke to D.L. about the tablet. D.L. indicated to A.B. that Rafford had recently obtained a tablet.

26. I called D.L. on December 9, 2025, to coordinate the pick up of the phone and the laptop from him. On December 10, 2025, one of my FBI partners picked up the laptop and the phone from D.L. The laptop is a Lenovo Thinkpad Laptop, with serial number PF-1SLQMH. The phone is an Apple iPhone. The laptop and the phone were submitted to the Oklahoma City FBI Field Office Evidence Room on December 10, 2025, where they are presently located. On December 12, 2025, one of my FBI partners interviewed D.L. telephonically and asked about these two devices. With respect to the laptop, D.L. indicated that he found the laptop following Rafford's arrest in the trailer in which Rafford was living, in the main living room, under a pillow, where it was plugged in.[2] D.L. indicated that Rafford received this laptop from a friend in El Reno, Oklahoma, sometime after Rafford returned from New York.[3] D.L. did not know the login information

---

[2] I believe that when D.L. is referring to a trailer, he is referring to the RV that I mentioned in paragraph 23 of this Affidavit.

[3] In a follow-up call with D.L. on January 7, 2026, D.L. explained to me that he knew this information because Rafford told D.L. that he had obtained the laptop from an individual. My understanding is that Rafford went to New York sometime after the execution of the residential search warrant.

for the laptop. With respect to the phone, D.L. indicated that he found the phone following Rafford's arrest in Rafford's car between the driver's seat and the console. D.L. indicated that he gave Rafford the phone to use shortly before he and Rafford went to New York. According to D.L., Rafford wiped the phone and used it, among others, as his main phone. To D.L.'s knowledge, no one else was using the phone other than Rafford.

27. In January 2026, I obtained federal search warrants for the tablet provided by A.B. and the laptop and phone provided by D.L. to search for evidence of Rafford's possession of or accessing with intent to view child pornography. I have not located any items of evidentiary value on the phone. On the laptop, I located web and search history indicative of an intent to view child pornography including: "young pussy play | MOTHERLESS.COM", "INCEST|OLD/YOUNG|ROUGH|FAT|REAL|MOTHERLESS.COM", "Very young fuck | MOTHERLESS.COM", and "Search – young gangbang | MOTHERLESS.COM". Though the laptop appeared to be used by multiple individuals, Rafford's accounts and pictures were located on the laptop. Finally, I have not yet reviewed the contents of the tablet provided by A.B.

## **III. 2018 Oklahoma City Police Department Investigation**

28. During my investigation, I also discovered Oklahoma City Police Department (OCPD) reports from 2018 in which Rafford's ex-wife, S.F. (who, at that time, had initials S.R.), alleged that Rafford had child pornography. S.F. provided 14 electronic devices to OCPD in 2018, and the devices presently remain at the OCPD Property Management Unit. Although OCPD obtained a signed Oklahoma County search warrant

for the search of these devices, the affiant (who was also the detective assigned to the case) is now deceased.

29. According to OCPD reports, S.F. made a walk-in report at the Oklahoma Police Department on May 1, 2018. She informed the officer taking her report that she had a victim protective order (VPO) against Rafford, who was arrested around April 25, 2018. S.F. advised that before Rafford was arrested, she and Rafford had been moving property out of their residence (located in Oklahoma City). At one point, Rafford dropped a flash drive on the ground. When S.F. picked up the flash drive and gave it back to Rafford, Rafford appeared extremely relieved that it was found. S.F. reported that Rafford was acting strangely about it and made comments that it was great that S.F. found it because Rafford did not want anyone else to find it. At the time, S.F. did not think much of the exchange. However, after Rafford's arrest, S.F. continued cleaning out the residence and found numerous flash drives in the garage, as well as a Micro SD card, a "seed drive" (external hard drive), and a computer tower. She took these devices with her to her new home. Around April 30, 2018, S.F. wanted to see what was on the flash drives. S.F. reported they were password-protected, but she was able to guess the password to one of them, which she labeled as #4. S.F. reported that on the flash drive, there were several videos, and she recognized two of them to depict child pornography. S.F. reported none of the depictions appeared to be filmed by Rafford and were instead videos downloaded from the Internet. S.F. recalled that there were six to ten different videos on the flash drive, but she did not continue to watch once she discovered what the content was. With respect to the computer S.F. brought to OCPD, S.F. indicated that she used the computer as a guest user

and did not have access to anything Rafford had in the memory of the computer. S.F. also mentioned that Rafford was very protective of a laptop, but S.F. did not have this device for OCPD.

30. According to OCPD reports, on the day of S.F.'s May 1, 2018, report, all of the devices provided by S.F. were booked into the OCPD Property Management Unit. A report indicates that S.F. provided OCPD with 14 total devices: ten flash drives; one seed drive; one computer tower; one Micro SD card; and one CD. One of those devices was a Verbatim flash drive wrapped in pink paper labeled #4 (the Subject Device).

31. OCPD reports indicate that on May 2 or May 3, 2018, the now-deceased OCPD detective conducted a follow-up interview with S.F. During that interview, S.F. indicated she and Rafford had been having marital problems; he had been using methamphetamine again and was not present for her emotionally. S.F. indicated she sought support through a male friend, and Rafford found out. S.F. indicated she had only talked to the male friend. When asked how Rafford found out, S.F. explained that Rafford came home late one night after being out with friends and saw S.F. talking to the other man. Rafford then became physical with S.F. Rafford was upset and put a knife to the back of S.F.'s neck, but he did not cut her with it. S.F. reported she ran out of the garage to another house, but Rafford dragged her back. S.F. said Rafford's abuse was off and on. When asked about other incidents of abuse, S.F. indicated that the week prior, Rafford was upset because he woke up late. Rafford hit S.F. a few times. With respect to the devices she provided to OCPD, S.F. explained that she located several flash drives when cleaning out

her and Rafford's Oklahoma City rent house.[4] She guessed the password to a folder on one of the flash drives (the "Elite Technologies" folder) and viewed videos inside of the folder. She explained that she believed the videos contained child pornography. She stated she observed prepubescent videos of females. The females were wearing lingerie or panties and a bra. According to S.F., the females did not have pubic hair and were either stripping their lingerie off or stripping each other's underwear off. She said she saw one female with a cucumber in her mouth simulating oral sex. S.F. said the females were touching each other's breasts, and some of the females were completely naked and simulating sex acts. S.F. explained she was unable to access the other flash drives that she provided to OCPD. She also again mentioned that Rafford had a laptop at his parents' house and had been secretive about that laptop.

32. OCPD reports further indicate that the now-deceased detective obtained an Oklahoma County search warrant for the devices on June 5, 2018. To my knowledge, the devices have remained in the custody of OCPD since they were seized on May 1, 2018.

**III. 2025 FBI Interview of S.F.**

33. On September 2, 2025, I spoke with S.F. at the Oklahoma City FBI Field Office. S.F. provided background information regarding her marriage with Rafford, including how Rafford committed several violent offenses—including breaking into her mother's home—toward the end of their marriage.[5] She disclosed that Rafford was also

---

[4] According to a draft affidavit authored by the deceased detective, S.F. reported that Rafford instructed her to place the flash drives in a box for him to move them out.

[5] These offenses would have occurred before S.F. provided devices to OCPD in 2018.

violent toward her during the end of the marriage. S.F. also disclosed that both she and Rafford were using methamphetamine at the end of the marriage.[6] With respect to the devices she provided to OCPD in 2018, S.F. recalled, "if [she] remember[ed] right," seeing a video of prepubescent, topless girls on one of the flash drives. According to S.F., the girls in the video were "not necessarily doing anything suggestive."

34. During this conversation, S.F. also provided consent to seize two hard drives that she had kept since 2018 from the garage of her house that she shared with Rafford, which was located in Oklahoma City, Oklahoma. She explained that when Rafford was in custody in 2018, she cleaned out the house and found the hard drives, which had not been seized previously by OCPD. The Seagate hard drive was found by S.F. in the garage's Digital Video Recorder system that held footage from all the cameras at the house. The Maxtor hard drive was found in the railing of the garage door system. I obtained a federal search warrant for each hard drive, but I did not locate anything of evidentiary value on either hard drive.

## CHARACTERISTICS COMMON TO INDIVIDUALS WITH INTENT TO VIEW, POSSESS, COLLECT, RECEIVE, OR DISTRIBUTE CHILD PORNOGRAPHY

35. Based on my previous investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals with the intent to view and/or possess, collect, receive, or distribute images of

[6] According to OCPD reports, however, S.F. told OCPD on May 1, 2018, that she had last used methamphetamine three years ago.

child pornography:

a. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children often use these materials for their sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their films, videotapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain photos, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years, and they often retain child pornography files among multiple

devices.

d. Likewise, individuals with the intent to view and/or possess, collect, receive, or distribute pornography often maintain their collections that are in a digital or electronic format in a secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interest in child pornography.

f. Individuals who would know how to access online forums, such as bulletin boards, newsgroups, Internet relay chat, or chat rooms are considered more advanced users and therefore more experienced in acquiring and storing a collection of child pornography images.

g. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography prefer not to be without their child pornography for any prolonged period and often repeatedly view child pornography. This behavior has been documented by law enforcement officers involved in the investigation of child

pornography throughout the world.

## BACKGROUND ON DIGITAL MEDIA STORAGE DEVICES AND CHILD PORNOGRAPHY

36. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Other digital media storage devices (e.g., compact disks, digital video disks, floppy disks, cell phones, Blackberries, iPhones, thumb drives, video gaming stations, etc.) can also store tremendous amounts of digital information, including digital video and picture files.

37. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer. Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data. Further, even if deleted, forensic examination can sometimes recover files and data including deleted picture files.

38. Computers and other digital file storage devices can store the equivalent of thousands of pages of digital information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires the searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks depending on the volume of the data stored, and it would be generally impossible to accomplish this kind of data search on site. Furthermore, I know that smart cell phones (a type of "computer," as broadly defined in 18 U.S.C. § 1030(e)) can typically "synch" with a traditional desktop or laptop computer. The purpose of synching a smart phone to a traditional computer is to back up data that is stored on the phone so that it is not permanently lost if the portable smart phone is lost or damaged. Also, smart phone users may move files off the smart phone and onto a computer to free up storage space on the smart phone. Similarly, computer (e.g., desktop computers, smart phones, etc.) users may move files off of one computer onto another computer or digital file storage devices such as a thumb drive, a DVD, or an external hard drive to free up space on the computer.

**SEARCHING COMPUTERS**

39. Searching computers for criminal evidence is a highly technical process requiring skill and a properly controlled environment. The search of a computer or computer system is an exacting scientific procedure designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is vulnerable to tampering or destruction, the controlled atmosphere of a laboratory is essential to complete this task. The FBI, Oklahoma City

Division ("OCD"), has such a laboratory staffed with certified computer forensic examiners. The Subject Device will be taken to the FBI OCD lab for analysis. Identical copies of the original storage media will be produced by the assigned forensic examiner so as to maintain the integrity of the original evidence.

## CONCLUSION

40. Based on the above information, there is probable cause to believe that 18 U.S.C. § 2252A(a)(5)(B) has been violated, and that evidence, fruits, and instrumentalities of these offenses are located on the Subject Device.

41. Based upon the foregoing, I respectfully request that this Court issue a search warrant for the Subject Device, described in Attachment A, authorizing the seizure of the items described in Attachment B to this Affidavit.

42. Because the requested warrant is for the search of a device already within law enforcement's possession, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Kalli Wakefield
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me this 30th day of January, 2026.

AMANDA L. MAXFIELD
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## DESCRIPTION OF THE SUBJECT DEVICE TO BE SEARCHED

1. Verbatim flash drive wrapped in pink paper labeled #4

The Subject Device is presently located at the Oklahoma City Police Department Property Management Unit.

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence of violations of 18 U.S.C. § 2252A(a)(5)(B), including:

1. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

2. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, distribution, or accessing with the intent to view (or the attempt to do so) child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, distribution, or accessing with the intent to view (or the attempt to do so) of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

3. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C.

§ 2256(2).

5. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the possession, receipt, distribution, or accessing with the intent to view (or the attempt to do so) of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

7. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

8. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or

remote computer storage.

9. Any and all visual depictions of minors engaging in sexually explicit conduct and any and all records indicating the identity of depicted minors.

10. Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of the user of the Subject Device described in Attachment A, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, as well as any emails, usernames, accounts, documents, and chat conversations that aid in identifying the user.

11. Any and all notes and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, contraband, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.